## THE STATE OF NEVADA, Respondent, v. RAYMOND PLUNKETT, Appellant.

No. 3403

November 12, 1943. 142 P. (2d) 893.

C. A. Eddy, of Ely, and W. E. Baldy, of Carson City, for Appellant.

Alan Bible, Attorney-General, W. T. Mathews and Geo. P. Annand, Deputy Attorneys-General, and John W. Bonner, District Attorney, of Ely, for Respondent.

## OPINION

By the Court, TABER, J.:

On February 23, 1943, in the Seventh judicial district court, White Pine County, appellant was convicted

of first degree murder, and later sentenced to death. His motion for a new trial was denied. On April 10 he served and filed notice of appeal from the judgment and from the order denying a new trial. On or about April 27 execution was suspended until the hearing and determination of the appeal.

On October 5 respondent noticed a motion in this court for an order dismissing the appeal and vacating the order suspending execution. On November 3 appellant moved this court for an order granting him leave to file a memorandum of errors and a bill of exceptions.

Respondent's motion was based upon the ground of failure to prosecute the appeal, no progress having been made in that respect since said 27th day of April. At the hearing of this motion on November 2 respondent showed that appellant's attorney, Mr. C. A. Eddy, had received, on or about May 1, a copy of the transcript of the proceedings and evidence had and taken at the trial; that on September 1 the district court made an order giving appellant thirty days in which to file a bill of exceptions and memorandum of errors; that no memorandum of errors has been filed nor bill of exceptions filed or settled; and that on said 1st day of September Mr. Eddy informed the trial court that attorney W. E. Baldy, of Carson City, Nevada, was associated with him in this case.

Mr. Eddy testified in part at said hearing that he was appointed by the district court to defend appellant, who was without funds; that he acted as his attorney at the trial, for which he was paid, by order of court, one hundred dollars (the maximum amount allowed by the statute) ; that for the last three years he has been afflicted with an illness which affects not only certain digestive organs, but his eyes as well; that he had three or four attacks of this illness during the trial, and has had four or five since May; that the only office help he was able to procure since being appointed to defend this case was an inexperienced stenographer, who after three months of training married and quit

her employment; that except as aforesaid he has been without help and has done everything he could without funds; that since the trial he has received only $50, all of which he has used for said stenographer, telephoning, and his trip to Carson City to resist this motion; that when his attacks of illness come on, he is unable to attend to business for two or three days; that when he first applied for a copy of the transcript he was refused because he had no funds; that he asked the county commissioners to furnish money to pay for copies of the transcript, one for himself, one for the attorney-general, and one for each of the supreme court justices; that the chairman told him that they would give him nothing—if they allowed anything it would be to the district attorney; that thereafter he tried again to get a copy of the transcript, but without avail; that shortly after the return of the district judge to Ely he made an order, about September 1, that a copy be furnished defense counsel; that district judge Watson's statement that witness had had a loan of a copy of the transcript long before September 1 is true, but it was an uncertified copy which is now in Mr. Baldy's possession; that it is true that the transcript was filed with the district court clerk some time prior to September 1; that during the month of September witness had two attacks of illness which delayed him probably a period of ten days; that he was unable to hire any help; that he had come to Carson City to resist this motion without any compensation for his services.

On cross-examination Mr. Eddy testified that he had applied to the district judge for an additional $100, but the application was not granted because that judge was of opinion that he had no authority to do so; that in September witness asked leave to withdraw from the case so he could go to Denver and consult a specialist about his eyes, but this request was later withdrawn, witness stating to the trial judge that he would stay with the case and do the best he could; that at this time Judge Watson told him that Mr. Baldy had asked for

additional time, and also told him that if he insisted on withdrawing from the case he would be permitted to do so; that he felt that if he insisted on withdrawing, he would probably be in contempt of court; that he had never asked for any stipulation for additional time within which to prepare and file a bill of exceptions; that from April 27 until September 1 no progress was made for perfecting the appeal; that witness made no appearance in court about October 1, and no bill of exceptions was submitted to the court for settlement until witness offered a proposed bill on October 16; that the district judge in effect denied the offer and suggested that the matter was now in the hands of the supreme court; that the bill was not accepted at that time; that the official reporter may have filed the transcript with the clerk about May 1, but she wanted $40 for a copy and witness didn't have the money to put up out of his own pocket; that it wasn't until after he had appeared before the county commissioners, thirty days or more after the transcript was completed, that the reporter lent him an unsigned copy of the transcript; that he did not, at the time of offering the proposed bill of exceptions to the district judge on October 16, represent to him that it was because of his illness that the bill had not been offered; that Judge Watson knows witness' physical condition, as it was two years ago that he had his first attack in court and Judge Watson sent him home, where he was put under a doctor's care; that the district judge did not give witness an order for a transcript until he returned to Ely from Carson City, where he had been holding court for Judge Guild.

In response to questions from members of the court, witness testified that he applied to Judge Watson before September 1 for an order for a transcript, but the judge said at that time that he couldn't do it; that the official reporter held off until September 1, when the court made the order that the county pay the bill; that the reason for not making application about October 1 for

a further extension of time was witness's physical condition, and the further fact that Judge Watson was away about that time and didn't come back until a little later; that witness has never made any application to file the transcript out of time, but now moves the court for an order permitting him to do so.

Mr. Baldy became associated with Mr. Eddy about one week before execution was stayed. He presented the application for a stay and for a certificate of probable cause, which was granted April 27. He states that he was employed by Mr. Plunkett; that he agreed with the latter that if he would pay him $25 for the time being, he would appear and participate at the time of the argument in the supreme court; that he knows Mr. Eddy has been handicapped at different times by his illness.

Mr. Eddy's office is at Ely, where the trial was held. Mr. Baldy's office is at Carson City, where this court sits. This distance between the two cities exceeds three hundred miles.

Section 11061 N. C. L. 1929 provides in part that when, in a district court criminal action, judgment upon a conviction is rendered, the clerk shall enter the same in the minutes and shall, within five days, annex together and file certain specified papers, which shall constitute the record of the action. Subdivision 9 of said section provides that the bill of exceptions, if any, when settled, shall be attached to such papers and become a part of the record.

Section 11081 N. C. L. 1929 relates to the settlement and certification of bills of exceptions in criminal cases. It provides, among other things, that a proposed bill shall be filed and served within ten days after the entry of the judgment. It also contains the following provision: "The time in this section mentioned for the performance of any act, upon stipulation or good cause shown, may be shortened or extended."

When an appeal is taken in such an action, the clerk

with whom the notice of appeal is filed must, within ten days thereafter, transmit to the clerk of the supreme court the notice of appeal and the record in the action. Sec. 11093 N. C. L. 1929.

Section 11094 N. C. L. 1929 reads: "If the appeal is irregular in any substantial particular, but not otherwise, the appellate court may, on a day in term, on motion of the respondent, upon five days' notice, with copies of the papers upon which the motion is founded, unless the irregularity can be cured by amendment and is so cured, order the same to be dismissed."

This court may also, upon like motion, dismiss the appeal, if the return be not made as provided in said sec. 11093, unless for good cause it shall enlarge the time for that purpose.

It was held in State v. Salge, 1 Nev. 455, that in criminal cases the time within which the bill of exceptions is to be signed by the judge is merely directory. And in State v. Baker, 8 Nev. 141, it was held that the section then in effect requiring bills of exceptions in criminal cases to be settled, signed, and filed within ten days after trial, unless further time be granted, was directory.

Respondent contends that its motion should be granted because appellant has not complied with the statutes relating to the perfecting of appeals in criminal cases; "in brief, that there has been unreasonable delay and laches on the part of the defendant and appellant in lodging his appeal in this court." Appellant's contention is that the motion should be denied "under the extenuating circumstances."

■■ Where there is reasonable excuse for delay or failure in presenting a bill of exceptions for settlement, the court should be liberal in securing to the accused the advantages given him by the law. State v. Baker, supra, 8 Nev. at page 145. The showing made in behalf of appellant in the instant case is not entirely satisfactory, and certainly counsel for the state are not to be

criticised for making the motion to dismiss; on the contrary, they have shown at least as much patience as could be reasonably expected of them. The trial court and its judge also appear to have manifested an attitude of fairness and forbearance. On the other hand, we cannot be unmindful of the fact that appellant is under sentence of death, and there is no suggestion that any of the delay is attributable to him personally. We have also to consider appellant's lack of funds, Mr. Eddy's illness, his inability to obtain stenographic help, and the fact that Mr. Baldy would naturally look to Mr. Eddy to take care of such matters as required attention at Ely. The court feels constrained, in view of all the circumstances, to afford appellant the opportunity to have a bill of exceptions settled, signed, and filed and made a part of the record on appeal.

Respondent's motion is denied, and the lower court is directed to allow appellant a reasonably short time within which to file with the clerk of that court a proposed bill of exceptions. When so filed, the district court is further directed, at its earliest convenience, to settle the bill in accordance with the provisions of sec. 11081 N. C. L. 1929, and counsel for appellant are directed to collaborate diligently with said court and with counsel for the state in expediting such settlement, so that the bill of exceptions may be attached to the other papers in the record of the action and filed in this court as a part of the record on appeal. In view of the fact that there has already been too much delay, it is ordered that instead of the thirty days' period allowed by rule II of this court for filing the transcript of the record on appeal, such transcript shall, in this case, be filed within fifteen days after the bill of exceptions has been settled. In the event that withdrawal of any papers in this case from the files of the clerk of this court will facilitate the settlement of said bill of exceptions or the perfecting of the appeal, application may be made to the court or one of its justices for an order permitting the withdrawal of such papers.

## On The Merits

May 9, 1944. 149 P. (2d) 101.

Raymond Plunkett was convicted of murder of the first degree and he appeals. **Affirmed with direction.**

*C. A. Eddy,* of Ely, and *W. E. Baldy,* of Carson City, for Appellant.

*Alan Bible,* Attorney-General, *W. T. Mathews* and *George P. Annand,* Deputy Attorneys-General, and *John W. Bonner,* District Attorney, of Ely, for Respondent.

## OPINION

By the Court, DUCKER, J.:

The defendant was convicted in the district court of White Pine County, of the crime of murder of the first degree. The jury fixed the penalty at death. His appeal is from the judgment and the order denying a new trial.

The criminal proceedings against him were initiated by a complaint filed in the justice court of Ely Township No. 1, of said county, the formal part of which is as follows:

"Before me this 14th day of December, A. D. 1942, personally appeared J. E. Orrock, in the County of White Pine, State of Nevada, who being first duly sworn, complains and says: That within his knowledge, information and belief, Raymond Plunkett * * * of Ely, White Pine County, State of Nevada, on or about the 10th day of December, A. D. 1942, and before the filing of this complaint, at Ely, in the County of White Pine, State of Nevada, did then and there without authority of law, commit the crime of murder, in the following manner: * * *"

On the complaint a warrant of arrest was issued on which the defendant was taken into custody.

A demurrer to this complaint, for lack of jurisdiction of the defendant and of facts sufficient to constitute a crime, was overruled, a preliminary examination was had, and the defendant held to answer. Defendant moved, in the district court, to quash the information filed against him upon the ground that the justice court did not have jurisdiction to hold him to answer because the complaint therein was made on information and belief and not upon the positive knowledge of the complainant, and also because the evidence adduced in the justice court did not show a crime had been committed, or that there was probable cause to believe the defendant guilty of a crime. A demurrer to the information was also filed on the same and other grounds. The motion was denied and the demurrer overruled. Defendant now contends on this appeal, that all proceedings in the district court were null and void by reason of this claimed defect of the complaint, and because of insufficient evidence to hold the defendant to answer.

██ It will be seen that the complaint conforms to the requirement in sec. 10728 N. C. L. that "if a complaint by proper affidavit, setting forth the nature of the charge, and the facts within the knowledge, information, or belief of the party making the same, is filed with the magistrate, and it sufficiently appears therefrom that an offense has been committed by some person known or unknown to the affiant, triable within the county, the magistrate may issue a warrant of arrest."

The appellant contends that this statute, insofar as it authorizes a complaint on information and belief, is unconstitutional, in that it runs counter to the search and seizure provision of the state constitution, which provides that "no warrant shall issue but on probable cause supported by oath or affirmation* *." Article I, section 18, of the Constitution of Nevada.

We do not think that a constitutional question is involved in this case. It is well settled that a constitutional question will not be determined unless clearly

involved, and a decision thereon is necessary to a determination of the case. State ex rel. Adams v. Adams, 55 Nev. 346, 34 P. 2d 1074. Unless such necessity arises the statute challenged will be presumed to be constitutional.

The complaint was not sworn to on information and belief merely, but on knowledge, information, and belief. The crime of murder charged against defendant was set out therein by positive and direct allegations of fact. However, if the complaint were deficient in the respect claimed, it would now be immaterial. Jurisdiction of the magistrate to issue the warrant of arrest was beyond question when the defendant failed by appropriate proceeding to attack the complaint prior to the preliminary examination. Had a proceeding of this character been pursued by defendant while held under the warrant of arrest, the constitutionality of said sec. 10728 could have been drawn in question. Ex parte Dimmig, 74 Cal. 164, 15 P. 619. His demurrer to the complaint in the justice court was not such a proceeding. There is no provision in the criminal practice act for a demurrer to a complaint filed with a magistrate. The defendant was committed on the evidence adduced at the preliminary examination. The information in the district court is founded on the commitment and not in any way on the complaint.

In California the practice concerning preliminary examination is substantially the same as ours, except that the proviso under which the complaint was filed in the justice court does not appear in the California statute. The supreme court of that state, in an early decision, announced the principle which we believe is controlling here. People v. Velarde, 59 Cal. 457. In that case the defendant moved the court below to set aside the information, because the affidavit upon which the warrant of arrest was issued was not sufficient to give the court issuing it jurisdiction. The higher court said:

"The motion was properly denied. The object of the

statute in providing for the issuance of a warrant of arrest, is, that the defendant may be brought before the committing magistrate, and when he is once there, and an examination of the case is had in pursuance of the terms of the statute, and the defendant is held to answer, a foundation is laid for the filing of an information by the District Attorney. The regularity of the proceeding by information did not therefore depend in any manner upon the affidavit on which the warrant of arrest was issued, and had no connection with it."

See People v. Wheeler, 65 Cal. 77, 2 P. 892.

In a later case of People v. Staples, 91 Cal. 23, 27 P. 523, the court said:

"But when a prisoner has been examined, and evidence adduced sufficient to justify the magistrate in holding him to answer on a charge of felony, the information in the warrant of arrest, if any there be, ceases to be of any consequence, since he is thereafter held under the commitment, which of itself authorizes the filing of an information. The regularity of the information does not depend on the complaint, but upon the order holding the defendant to answer."

The court further said:

"It is the duty of the magistrate to hold the defendant to answer for the offense proved, whatever may have been the offense charged."

That this is so here, is obvious from the provisions of sec. 10785, which provides:

"If, however, it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof, the magistrate must make or indorse on the depositions and statement, an order signed by him to the following effect: 'It appearing to me by the within depositions and statement (if any), that the offense herein named (or any other offense according to the fact, stating generally the nature thereof) has been committed, and that there is sufficient cause to believe the within named

A. B. guilty thereof, I order that he be held to answer the same.'"

■ Under this statute the complaint which defendant claims is so fatally defective as to have deprived both the magistrate and the district court of jurisdiction by reason of its being sworn to on information and belief, the court could have held defendant to answer for any felony shown by the evidence. People v. Staples, supra; People v. Lee Look, 143 Cal. 216, 76 P. 1028; People v. Storke, 39 Cal. App. 633, 179 P. 527.

Defendant concedes that the California cases are authority for the principle we deem applicable here, but he asserts that they have been overruled on the point in People v. Howard, 111 Cal. 655, 44 P. 342. This is true, but People v. Howard, as well as People v. Christian, 101 Cal. 471, 35 P. 1043, which the former case stressed as an authority of persuasive quality, was in turn overruled by People v. Look, 143 Cal. 216, 76 P. 1028, which held that the fact that a complaint before a magistrate fails to charge an offense, is of no consequence and will not warrant setting aside the information, where the defendant has been properly committed after a hearing at which evidence was introduced. The court cited to the ruling a number of cases of the California Supreme Court, including People v. Velarde, supra; People v. Wheeler, supra; People v. Staples, supra; People v. Dolan, 96 Cal. 315, 31 P. 107, and People v. Cole, 127 Cal. 545, 59 P. 984.

Quoting from People v. Velarde, supra, as we have, the court said [143 Cal. 216, 76 P. 1029]:

"If there be anything inconsistent with these views in the two department cases of People v. Christian, 101 Cal. 471, 35 P. 1043, and People v. Howard, 111 Cal. 655, 44 P. 342, cited by appellant, they must be considered, so far as they are thus inconsistent, as overruled by the other cases above cited."

By the same token the case of the United States v. Collins, D. C., 79 F. 65, cited by defendant, construing

the California Code and following People v. Christian, supra, and People v. Howard, supra, "went by the board." See also People v. Storke, 39 Cal. App. 633, 179 P. 527, in line with People v. Lee Look, supra.

 We have read all the other cases presented by defendant and find nothing in them that causes us to doubt the correctness of the conclusion we have reached, that a preliminary examination having been had in accordance with the terms of the statute, and the defendant held to answer for a public offense, to-wit, a felony, any infirmity in the complaint, if there be any, is of no consequence, and a proper foundation was laid for the filing of the information. The objection that the evidence taken at the preliminary examination was not sufficient to show probable cause for committing defendant, could not be raised by motion or demurrer to the information. Both were properly disposed of by the ruling of the lower court.

 Other assignments of error require a statement of facts. The evidence discloses that the deceased was a child of defendant and of the age of about five months. On December 10, 1942, the date of its death, and for some time prior thereto, defendant and his wife were living in an apartment in what was known as the Renshaw Hotel in Ely, which they had under lease. Across the hall from their apartment, in a room called No. 1 Apartment, lived a woman by the name of Mrs. D. A. Prew. The building was a wooden structure with thin walls, and sounds made in defendant's apartment could be clearly heard in Mrs. Prew's room. Defendant was a miner and working in Kimberly, a small mining town in White Pine County, near Ely. His wife worked in a laundry in Ely. Often when the parents were away the child was left in their apartment alone. On several of these occasions Mrs. Prew, when she heard the child crying, had gone in and taken care of its immediate wants. On the day of its death it had been left alone, and the lady hearing it crying during the forenoon, went in and found it lying on a cot. The

child was wet and mussed and cold and hungry. She ministered to its needs, and returning around 12:30 p. m. saw it asleep. Hearing it crying again somewhere around 1:45 she returned and cared for it as she had done earlier. About 2:35 she saw defendant come into the building. He went into the apartment where the child was and shut the door. Two of the roomers in the hotel saw him in his apartment about 3:30 p. m. and one of them talked with him. Around 4 o'clock in the afternoon Mrs. Prew and a lady visiting her in her room heard a baby scream three times in defendant's apartment. About 5 o'clock in the afternoon his wife came from her work and went into the apartment. He opened the door and let her in. Near the hour of 7 o'clock she was heard screaming in the hall. Shortly afterwards several persons, including a doctor and the sheriff, entered the apartment. They came upon a gruesome scene indicating a patricide and attempted suicide. The baby was found lying on a cot, dead. The body was in a badly bruised condition. Defendant was lying on a bed with an incised wound in his left wrist, bleeding excessively. He was conscious but extremely weak from loss of blood, and near him was a black-handled razor. To one of the witnesses defendant asked what had happened and said he didn't know, "I must have been crazy, everything went black." No one else had been in defendant's apartment from the time he arrived, other than himself, wife and child, until the first of said witnesses entered.

At the hospital on the same evening in the presence of the district attorney (Mr. Bonner) and the sheriff, defendant made the following statement, as testified to by the sheriff:

"He said he thought he had been working too hard. That he had been drinking. That he had had five or six drinks, and that he must have went kind of crazy. That everything had went kind of black—had blackened out. He said the next thing he met three boys who tried to rent an apartment, and at that time everything went

black on him and the next thing he saw was his baby, and he said, 'I must have went crazy.' The baby was dead about 4 o'clock. He said he studied and figured how such a thing could have happened. At approximately 5 o'clock his wife came home and he didn't tell her anything. He said, 'I couldn't figure how it happened.' That is about all I can remember.

"Q. Did he make any reference to the wound which he had inflicted on his wrist at that time? A. Yes, he did, He said, "That is why I figured I was not fit to live. If I did such a thing I figured I was not fit to live.' "

The defendant was taken into custody by the sheriff, removed to a hospital and thence to the county jail. A few days later, in the county jail, in the presence of the district attorney and a deputy sheriff, defendant made a statement which was reduced to writing, and signed by him. The statement is rather long and somewhat rambling and therefore will not be set out. Suffice it to say, it was of the same general tenor of the statement made in the hospital, except it did not contain the expressions: "That is why I figured I was not fit to live. If I did such a thing I was not fit to live." It did, however, contain the following, which was not in the former: "I had no intention of doing it. I would cut off both arms right now if it would take it back."

Dr. G. O. Bradley testified on the part of the state. He was shown to be a practicing physician and surgeon. He was summoned to the apartment shortly after the death of the child was discovered, reaching the scene about 7:30 p. m. He found the baby on a cot dead, and made an examination of the body. He described to the jury the nature of the various bruises and other injuries on the head, particularly on the face and neck, and gave it as his opinion that the child had been dead between three and four hours. It was quite likely, he stated, that the child expired around 3:30 in the afternoon. In the doctor's opinion the injuries caused the death of the child and were inflicted by the hands of some one.

The foregoing statement of the evidence, while not

exhaustive, is sufficient to overthrow defendant's contention that the corpus delicti was not proven, or his guilt of first degree murder established.

It is earnestly insisted that Dr. Bradley's testimony was not sufficient to prove the corpus delicti. The following is a summary of his testimony on this point:

"There were various bruises on the baby's neck and face and the lips were swollen and edematous. The alae-nasi, the attachment of the nose to the face was lifted up and broken loose from their attachments to the face. The right eye, the soft tissue surrounding the right eye, was swollen and edematous—black and blue. There was a large bruise on the left side of the face at the angle of the jaw extending up and down the cheek. There were bruises also on the right side of the face corresponding to those on the left, and additional bruises extending up on the forehead from the cheek up into the hair of the child's head. There were contusions about the neck but no abrasions or lacerations or blood. The only blood that was observable had come from the broken area of the nose where it is attached to the face, as well as from the nares— that is from the nasal cavities. There had been no bleeding from the mouth or from the ears. Nothing except from the nose. The baby was dead and cold. * * *"

"Q. From your testimony, which you have just given, and based upon reasonable medical certainty, do you have an opinion as to what might have caused the death of the child? A. From the examination and appearance of the child's face, it occurred to me that a large hand could have been in that manner (indicating hand spread over face with fingers spread and extended) been placed on the baby's face. * * * From a careful examination of the child's face I cannot see how the injury could occur from an accidental injury, for instance, a fall. * * * It was more or less apparent that there had been some force exerted on the baby's face in a squeezing. or vice-like mechanism that would

produce sufficient violence on each side of the face as well as on the top of the face, and extend the tissues backward and upward with sufficient force to cause these injuries which would show so plainly in three or four, or three and a half hours after the child had received the injuries, so that is my impression and opinion. * * *

"Q. About how high was that cot? A. I imagine thirty inches.

"Q. Basing your answer upon reasonable medical certainty, would it have been possible for the baby to have sustained such injuries by falling out of the cot on to the floor? A. No."

On cross examination the witness was questioned, and answered as follows:

"Q. How long, do you think, from your examination, the child lived after the injuries were inflicted? A. Not very long.

"Q. Possibly thirty minutes to an hour? A. No, it didn't live longer than thirty minutes. I would say that was the limit."

■ The competency of the witness to testify as he did is not questioned, and we think from his testimony, the jury could have reasonably concluded, as they evidently did, that the child's death was the result of the injuries shown and were caused by the hands of some person. True, the doctor gave only his opinion and thought as to the cause of death and the means employed, but the thought expressed was clearly his judgment. People v. Durrant, 116 Cal. 179, 48 P. 75. As stated in State v. Buralli, 27 Nev. 41, 71 P. 532, 535:

"It is generally held that physicians may give their opinion as to the cause, effect, and consequences of wounds."

■ The corpus delicti, like the fact of guilt, may be proven by circumstantial evidence. State v. Tranmer, 39 Nev. 142, 154 P. 80; State v. White, 52 Nev. 235, 285 P. 503.

The suggestion that the injuries may have resulted from a fall finds no support in the testimony.

The evidence is clearly sufficient to sustain the determination that the child came to its death on the afternoon of December 10th at the hands of defendant in a cruel and unnatural manner. The three screams heard by the women denoted its mortal agony. One of them described the screams as "terrible" and the other as "awful." The nature of the injuries on the body bear mute evidence of the torture to which the child was subjected by an unnatural parent. As it clearly appears from the legal and substantial evidence set forth that the verdict and judgment find support therein, we have deemed it of no profit·here to summarize or comment on the evidence introduced and relied on as a defense. Suffice it to say that it was not of a character calculated to create a reasonable doubt in the minds of reasonable men as to defendant's guilt.

We will now examine rulings made by the court as to the admission and rejection of evidence claimed by the defendant to be erroneous, as well as the rulings refusing certain instructions offered by him.

■■ Objection to testimony which tended to show that defendant attempted to commit suicide by cutting his wrist with a razor, was overruled by the court. There was no error in this. The fact that an accused attempts to commit suicide, or evidence sufficient to justify such an inference, is always proper for the jury to consider in connection with the other evidence in the case. People v. Duncan, 261 Ill. 339, 103 N. E. 1043; State v. Jaggers, 71 N. J. L. 281, 58 A. 1014, 108 Am. St. Rep. 746; State v. Painter, 329 Mo. 314, 44 S. W. 2d 79; State v. Lawrence, 196 N. C. 562, 146 S. E. 395; People v. Barrett, 22 Cal. App. 780, 136 P. 520; State v. Blancett, 24 N. M. 433, 174 P. 207; 1 Wharton's Criminal Evidence, 11th ed. 412.

■■ The authorities quite generally agree that attempt at suicide by an accused is akin to flight, and

admissible on the same principle. 20 Am. Jur. 272. True, in this case the defendant had not been charged with the crime at the time of the attempt. The accusation, however, followed so hard upon the act as to leave no room for refinement of principle on that account. Indeed the act at self-destruction was so clearly connected with the killing of the child as to constitute it a part of the res gestae, and admissible for that reason also. Murder and suicide, or attempted suicide, are twin crimes of such frequent occurrence as to establish in the common mind a connection of enormous guilt.

Defendant pins his reliance on State v. Coudotte, 7 N. D. 109, 72 N. W. 913, but this is a lone case which is distinguishable from the generality of authority on the point of attempted suicide by an accused being a circumstance in a homicide case proper to be considered by the jury in connection with all the evidence. While we do not agree with all the reasoning of the court in that case, we are not prepared to say that under its particular facts the conclusion reached by the court that the attempt at suicide by the accused, a Sioux Indian, was inadmissible, was wrong. There were no other facts or circumstances with which it could be considered by the jury as tending to show guilt, and to be given such weight, or no weight, as the jury might determine. It was sought to be proven as an isolated circumstance sufficient in itself to furnish the corroboration of the testimony of an accomplice, required by the statute, as to the guilt of an accused. The court held that it was not enough and reversed the case. As pointed out in State v. Painter [329 Mo. 314, 44 S. W. 2d 82], in reviewing the Coudotte case:

"The court was not called upon to and did not decide whether or not, had there been otherwise a submissible case made, the attempt to commit suicide might have been proved as a circumstance for the consideration of the jury."

However, we think the ruling should not be extended beyond such or similar facts. Moreover, also unlike the

instant case, there was evidence in the North Dakota case tending to show that the attempt was unconnected with the killing, and due to a trait of the Sioux Indian nature, particularly of that period (1897), which could not brook restraint. Commenting on the environment, the court said [7 N. D. 109, 72 N. W. 916]:

"This defendant, an Indian, finds himself torn from his tribal surroundings, and incarcerated in a prison of those whom he regards as his hereditary enemies. He is charged with the murder of a white man. He believes himself to be absolutely in the hands of those who hate his race. He is ignorant of our laws and our court proceedings. * * * Seeing only the blackness of darkness ahead of him and that irrespective of his innocence or guilt, would it be strange that his nerve should fail him, and he seek to shut out the hated picture by severing his hold upon life? Moreover, he comes of a race whose untamed natures cannot brook confinement."

A witness in the case who had spent practically his entire life with the Sioux Indians, and who spoke their language and understood every phase of their character, the court said, testified: "I have often known, if an Indian is put in the guard house for any little offense, I have known them to cut themselves, and try to commit suicide in many different ways. That seems to be a predisposition among them, in confinement. I have frequently known of Indians attempting suicide because they were in confinement. I was present at a conversation with Coudotte in the Emmons County jail. He spoke in my presence in relation to his attempt to commit suicide. He said he could not stand to be confined, and he would just as soon be dead as to * * * stay in there and stand the confinement."

We have commented on the Coudotte case at some length because it is the only case cited by defendant on the point, and to make clear our opinion that it stands in a class by itself.

There was no error in the ruling of the lower court

in the instant case in admitting the evidence tending to show an attempt at suicide.

■ Objections were taken to the testimony of several witnesses as to the conduct of the defendant in regard to the child, namely, indifference to its welfare in leaving it alone for hours at a time in the sordid surroundings shown by the evidence, manifestations of dislike for it, not only by such neglect, but in preventing others from giving it attention, and in slapping and spanking it on occasions. We think the feeling of the defendant for the child, as this testimony on the whole tended to show, was proper for the jury to consider, as bearing in some slight degree on malice and motive. State v. Larkin, 11 Nev. 314; People v. Barthleman, 120 Cal. 7, 8, 52 P. 112. Besides, much of the testimony of the above character was admitted without objection.

■ There was no error in admitting in evidence the statements made by the defendant, both oral and written. They did not amount to confessions, but were statements against interest. Consequently the foundation required for the admission in evidence of a confession was not necessary. State v. Behiter, 55 Nev. 236, 29 P. 2d 1000; People v. Weber, 149 Cal. 325, 86 P. 671. However, it appears that no inducements were made or duress applied to the defendant. The statements were quite voluntary. In none of these statements did he admit the killing, nor did he deny it. The idea sought to be imparted was that something went wrong with his mind and he didn't remember what happened. There is no merit in the contention that the statements were inadmissible on account of his mental weakness due to the loss of blood from the wounds he inflicted on himself with the razor. Dr. Bradley, who was among the first to see defendant thereafter, and who gave him first aid treatment, testified that he talked with him and that he was completely in command of his mental faculties. The ruling of the court in refusing to grant defendant's motion to strike

the testimony of Mrs. Prew, in which she stated. "About four o'clock—a quarter to four—I heard the baby give three awful screams, the last one was not as loud as the first two," is assigned as error. It was not an erroneous ruling: No objection was interposed to the question that elicited this testimony, and the motion was belated as two more questions had been asked and answered before it was made. Besides, as the baby was across the hall and in another room, the jury must have understood that Mrs. Prew could not positively identify the screams as coming from the Plunkett child. That was a matter of inference for the jury.

Defendant complains that the court committed error in sustaining the objection of the district attorney to the following question asked of Dr. Bradley, a witness for defendant: "You will state whether or not people that have injuries and shock such as defendant had on the 17th day of May 1942 are often left in a condition in which that shock or other mental conditions recur as a result of that shock?"

Before the question was propounded the doctor had testified that on May 17, 1942, he had treated defendant for wounds received in an automobile accident, consisting of abrasions and contusions about the chest, a wound on the bridge of the nose, and a fracture of the nasal bone. The witness had also testified that the defendant was in some degree of shock but not a deep degree; and that his treatment extended over a period of ten days, after which he was released without permanent disability, except a scar on the right aspect of the bridge of the nose.

It is contended that the evidence proposed to be elicited by this question would tend to prove that the injuries sustained by defendant might cause a recurrence of shock which would leave him in a mental condition wherein he would not be responsible for his acts. The proposition is highly speculative and, conceding without deciding, that the witness had been qualified as an expert on insanity, the proposed evidence would have

no tendency to prove that there was such a recurrence at the time of the killing. No offer was made to connect it up in this manner. Besides, if there had been error in the ruling, it was rendered harmless by the subsequent ruling of the court by which the witness was permitted to answer a question of substantially the same tenor. And for the further reason this witness, who, as previously stated, was one of the first to see defendant on the evening of December 10, and talked with him at that time, testified concerning his mental condition, as follows:

"Q. From that conversation did he appear to be rational? A. Rational.

"Q. Would you say, in your opinion, whether he had lost his mental faculties at that time? A. No, he was completely in command of his mental faculties, although the reactions of mentality were retarded, and he made his replies with effort.

"Q. Were his replies intelligent? A. Quite coherent."

It is insisted that it was error to sustain the state's objection to the following question asked of Mazie Chester, a witness for defendant: "Q. I ask you to state, from your acquaintance with him, as to his appearance of having rational mental capacity?" There was no improper exercise of discretion in this ruling. The witness has met defendant only twice and there is nothing to show that the meetings were otherwise than casual, without opportunity for such observation as would have enabled the witness to form any judgment of value as to his mental condition. As said in State v. Lewis, 20 Nev. 333, 22 P. 241, 246: "The court must be satisfied that witness has had opportunity, by association and observation, to form an opinion as to the sanity of the person in reference to whom he is to speak; but as to the extent and character of the evidence, no better rule can be established than to leave it within the discretion of the court."

Many exceptions have been noted in defendant's

opening brief as to the rulings of the court in the trial of the cause. By particular mention and discussion of some, it must not be thought that we have overlooked any. All have been considered, as the gravity of the case has warranted.

In the ruling of the court upon the instructions, six errors are asserted. The first is as to defendant's proposed instruction number 1. The court was requested to instruct the jury that under the law and the evidence they would not be justified in finding a verdict for any higher grade of offense than manslaughter. The instruction was properly overruled. The court gave to the jury the statutory definitions of manslaughter, voluntary and involuntary, but there was no evidence tending to show manslaughter. Defendant's statements by themselves refute the suggestion.

The second is to his proposed instruction number 2, that where evidence raises only a mere suspicion of guilt the defendant should be acquitted. There was no error in the ruling refusing this instruction. It was sufficiently covered in the statutory definition of reasonable doubt which the court gave the jury.

The third assertion of error is to defendant's proposed instruction number 3, as follows: "The court instructs the jury that there is no evidence on which to find the defendant guilty of any crime and that by your verdict you must find the defendant not guilty." The refusal of the court to give it was warranted by the evidence.

The fourth is to defendant's proposed instruction number 4 to the effect that any attempt to commit suicide was not evidence tending to prove the guilt of defendant. What we have heretofore said is the law in that respect and disposes of this contention.

The fifth claim of error goes to defendant's proposed instruction number 5, which is as follows: "The court instructs the jury that while express malice and passion may co-exist, and a homicide be the result of

both, express malice and irresistible passion, as defined by statute, cannot co-exist; premeditation and deliberation being in express malice and wanting in irresistible passion." The instruction was properly refused, because there was no evidence of irresistible passion in the case. The principle of the instruction, as recognized in the case of State v. Salgado, 38 Nev. 413, 150 P. 764, has no application here.

■ The sixth and last assertion of error is levelled at the court's ruling in refusing defendant's proposed instruction number 6, which reads: "The court instructs the jury that where a death is caused by accidental means and without any intent so to do, in doing a lawful act such killing does not constitute a criminal offense and is not punishable as a crime, and constitutes an excusable homicide." As an abstract proposition of law the requested instruction is correct, but there was no evidence in the case warranting such an instruction.

The motion for a new trial was properly denied.

■ No error, of any consequence, at least, appears. The defendant was given a fair and impartial trial. The verdict of the jury expressed the only rational conclusion deducible from the facts of the case. True, the evidence tending to show motive is very slight, but if there were none at all it would be of no importance, under the proof. As said in People v. Durrant, 116 Cal. 179, 48 P. 75, 82:

"Where the perpetration of a crime has been brought home to a defendant, the motive for its commission becomes unimportant. Evidence of motive is sometimes of assistance in removing doubt, and completing proof which might otherwise be unsatisfactory; and that motive may either be shown by positive evidence, or gleaned from the facts and surroundings of the act. The motive then becomes a circumstance, to be considered by the jury, and its absence is equally a circumstance in favor of the accused, to be given such weight as it deems proper. But proof of motive is never indispensable to a conviction. * * * The wellsprings

of human conduct are infinite, and infinitely obscure. An act may owe its performance to complex and multitudinous promptings. Who

> 'knows each chord its various tone,
> Each string its various bias.'?

"Or the deed may be due to a single dominant impulse."

It is not our province, therefore, to inquire as to the motive that prompted this enormous crime.

The judgment and order appealed from are now affirmed and the district court is directed to make the proper order for the carrying into effect, by the warden of the state prison, the judgment rendered.