**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Curtis Leroy LOVE and Alto Oglesby,
Defendants-Appellants.**

**No. 71–2393.**

United States Court of Appeals,
Fifth Circuit.

July 23, 1973.

Curtis Leroy Love, pro. se.

Fletcher N. Baldwin, Jr., University of Fla., Gainesville, Fla. (Court Appointed), for Oglesby.

John L. Briggs, U. S. Atty., Alan C. Todd, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Labor problems between Overland Hauling Company and Teamsters Local 385 are not new to this court. See NLRB v. Overland Hauling, Inc., 461 F. 2d 944 (5th Cir., 1972). The instant criminal case grows out of an incident of violence during a 1969 labor dispute between Teamster Local 385 and Overland Hauling. The issues on this appeal arise from convictions for violation of 18 U.S.C. § 844(i) [1] and 26 U.S.C. § 5861(d) [2] and present questions of constitutional dimension, the resolution of which require a detailed recitation of facts.

Overland Hauling's Jacksonville, Florida terminal had been on strike for several weeks when its management became concerned for plant security. Its urgings and some underground rumblings of the violent eruption to come brought

[1]. (i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

[2]. It shall be unlawful for any person—
(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.

federal, state and local law enforcement officials to the Overland terminal. A twenty-four hour stake out of the terminal began.

On April 16, 1971, at approximately 10:30 P.M. the waiting officers saw a car approach an isolated area of the Overland Terminal—a spot where the main building was also close to the road. As the car slowed to a stop the officers observed a big man jump from the passenger side of the car and lob a package trailing sparks onto the roof. The observing agents quickly radioed what they had seen to other agents in cars patrolling the access roads to the terminal. Even as the suspect car pulled away from the building, federal, state and local units were converging. They stopped the car containing defendants Love and Oglesby which had then traveled less than two-tenths of a mile from the building. The defendants were under arrest within sixty seconds of the bomb being tossed.

On radio confirmation of the bombing other agents began to clear the Overland Hauling terminal. The principal agent on the scene warned the occupants of the building by firing his carbine several times and by shouting. The bomb exploded some five minutes after it was tossed, causing property damage but without loss of life or personal injury. Three members of the Teamsters Local 385 on picket line duty at the time of the blast were stopped and searched. After having been detained for some thirty minutes, they were released to continue picketing. It is undisputed in the record that these pickets were stopped and frisked solely as a precaution against further acts of violence and not because they were suspects to the bombing itself.

Love and Oglesby were taken to the local police station where their hands were swabbed with an acetone solution and the swabs preserved for chemical analysis. Their clothing was also searched and crumbs removed from the pockets. The time was approximately midnight. At the arraignment the following morning they appeared with retained counsel. On counsel's learning of the swabbings, the attorney procured the services of a chemical analyst. The chemistry expert made his presence in the case known to police laboratory officials.

Tests were conducted more than ten days after the arrests and confirmed the presence of nitrate on defendants' hands, as well as traces of straight dynamite in their clothing. The material on the acetone swabs was consumed in the testing process.

Defendants sought discovery of the government's scientific evidence under Federal Rules of Criminal Procedure 16(a). The government agreed not only to disclose the report of the acetone tests, but permitted the defendants' expert to examine the surviving samples of straight dynamite, perform his own tests on the material and examine the government's scientific methodology of the acetone tests. Due to the consumption of the acetone swabbings, the defendants' expert was unable to duplicate tests of the swabbings of defendants' hands.

At trial the prosecution introduced the chief chemist, who testified to the procedures used on the swabs and other trace materials. His testimony showed the presence of nitrate on the hands and straight dynamite in the pockets and on the clothing of the defendants. He also testified that residual traces of straight dynamite were found at the Overland Hauling bomb site. Defendants testified that they worked as truck drivers on a job using nitrate fertilizer, and defendants' expert testified that the nitrate found by the acetone swabbings could have been from that source. No rebuttal of the straight dynamite found in and on the clothing was presented. Indeed, the defendants' expert concurred in the prosecution's expert witness's analysis of the material he was able to test and the procedures used in the testing of the acetone.

We turn first to appellant Love. By letter to the clerk of this court dated February 8, 1972, Love elected to proceed in this appeal without counsel even though he was notified that counsel would be appointed by the court to represent him on appeal. Love subsequently failed to file an appellate brief. Since Love is not proceeding in forma pauperis, it is therefore appropriate that his appeal be dismissed pursuant to this court's Local Rule 9(b) [3] for failure to prosecute his appeal, and it is so ordered.

Appellant Oglesby has raised the following issues on appeal: (1) that he was entitled to the presence of counsel when the acetone swabs were taken; (2) that his expert witness should have been notified when the swabs were tested because there was a reasonable expectation that the tested material would be consumed in the process; and (3) that the district court erred in imposing maximum consecutive sentences without disclosure of any part of the pre-sentencing report.

■ Oglesby's Sixth Amendment contention proceeds on the assertion from United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that counsel is required at critical stages of the criminal process, and, in his view, what could be more critical than the removal of swabbings. There is no doubt that defendants were validly arrested and that the swabbings were a search and seizure incident to that arrest. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). But the presence of counsel at the taking of the samples was not constitutionally required. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). In considering whether Fourth and Sixth Amendment rights were violated by admission into evidence against a defendant of a palm print taken in the absence of counsel, but after counsel had been requested, we said:

"The record reveals, and Appellant admits, that he was legally in the custody of law enforcement officials stemming from arrest on another unrelated matter. It is undisputed, then, that the custodial officers were well within their authority, and not without Appellant's rights, to require that he submit to fingerprinting independent of the presence or absence of warnings to accused of his rights to counsel and to remain silent. United States v. Gibson, 5 Cir., 1971, 444 F.2d 275. Neither can it be argued that the Fourth Amendment erected any obstacle to the taking Appellant's fingerprint exemplars under the facts present here. The obtaining of physical evidence from a person involved a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents and the subsequent search for and seizure of the evidence. United States v. Dionisio, 1973, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 [1973]. Here the fact Appellant was legally under arrest at the time his palmprint exemplar was taken removes the first level of potential Fourth Amendment infringement. As for the second level, the Supreme Court noted in Davis v. Mississippi, 1969, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed. 676, that while the

---

3. (b) Failure to Prosecute. When an appellant in either a docketed or non-docketed appeal, other than an appeal in forma pauperis from a judgment of conviction or from the denial of a petition for writ of habeas corpus or denial of a petition filed under 28 U.S.C. § 2255, fails to comply with the rules of this Court requiring the processing of such appeal to a hearing, the Clerk shall enter an order dismissing said appeal for want of prosecution, and shall issue a certified copy thereof to the Clerk of the District Court as and for the mandate. In no case shall the appellant be entitled to remedy his default after same shall have been dismissed under this rule, unless by order of this Court.

seizure of the person is clearly subject to Fourth Amendment 'reasonableness', the taking of physical evidence in the nature of fingerprinting, or as here palmprints, 'involves none of the probing into an individuals' private life and thoughts that marks an interrogation or search.'

"Appellant, upon being apprised of his constitutional rights, properly invoked his Sixth Amendment right to have counsel present before further questioning. The record shows that the interrogation ceased at that point. The taking of Appellant's palmprints in the absence of counsel did not violate his constitutional rights. We have written that 'the taking of the fingerprints exemplar is not such a critical stage of the criminal proceedings as would entitle Appellant to the assistance of counsel.' Pearson v. United States, 5 Cir., 1968, 389 F.2d 684, 686. Furthermore, we think the present appeal analogous to one heard by the D.C. Circuit where they wrote that '[N]ot only is the taking of the exemplars not a critical stage of the proceedings entitling an accused to the assistance of counsel, but appellant has pointed to no function counsel could perform, were he present, save the futile advice not to give the sample.' Lewis v. United States, 1967, 127 U.S.App.D.C. 269, 382 F.2d 817, 819."

United States v. Sanders, 477 F.2d 112 (5th Cir., 1973). The reasoning of *Sanders* was re-enforced by the Supreme Court's recent decision in Cupp v. Murphy, *supra*:

"The inquiry does not end here, however, because Murphy was subjected to a search as well as a seizure of his person. Unlike the fingerprinting in *Davis*, the voice exemplar obtained in United States v. Dionisio, *supra*, or the handwriting exemplar obtained in United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99, the search of the respondent's fingernails went beyond mere 'physical characteristics

. . . constantly exposed to the public,' United States v. Dionisio, supra, and constituted the type of 'severe though brief intrusion upon cherished personal security' that is subject to constitutional scrutiny. Terry v. Ohio, supra, 392 U.S. 1, at 24–25, 88 S.Ct. 1868 at 1882, 20 L.Ed.2d 889.

"We believe this search was constitutionally permissible under the principles of Chimel v. California, 395 U. S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. *Chimel* stands in a long line of cases recognizing an exception to the warrant requirement when a search is incident to a valid arrest. Id., at 755–762, 89 S.Ct. 2034, 2035–2039. The basis for this exception is that when an arrest is made, it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then in his possession. *Id.*, at 762–763, 89 S.Ct. 2034, at 2039, 2040. The Court recognized in *Chimel* that the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement. Thus a warrantless search incident to arrest, the Court held in *Chimel*, must be limited to the area 'into which an arrestee might reach.' 395 U.S., at 763, 89 S.Ct. at 2040."

. . . . . .

"At the time Murphy was being detained at the station house, he was obviously aware of the detectives' suspicions. Though he did not have the full warning of official suspicion that a formal arrest provides, Murphy was sufficiently apprised of his suspected role in the crime to motivate him to attempt to destroy what evidence he could without attracting further attention. Testimony at trial indicated that after he refused to consent to the taking of fingernail samples, he put his hands behind his back and appeared to rub them together. He then put his hands in his pockets, and a 'metallic sound, such as keys or

change rattling' was heard. The rationale of *Chimel*, in these circumstances, justified the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails, cf. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L. Ed.2d 908.

The nitrate on Oglesby's hands was even more likely to vanish than the materials lodged under Murphy's fingernails, or the alcohol in Schmerber's blood. The first vigorous scrubbing of the hands would have destroyed Murphy's material, but merely rubbing the hands would have destroyed the nitrate oils. Moreover, since Oglesby could testify whether the swabbings were actually taken and sealed, counsel could perform no service justifying invocation of constitutional principles. Cf. *Wade, supra*; United States v. Sanders, *supra*. No Fifth Amendment challenge has been raised. Cf. Cupp v. Murphy, *supra*, opinions of Mr. Justice Marshall concurring and Mr. Justice Douglas dissenting in part; but see United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Schmerber v. California, *supra*;

Cassady v. United States, 410 F.2d 379 (5th Cir., 1969); Napolitano v. United States, 340 F.2d 313 (1st Cir., 1965). See also United States v. Ryan, 478 F.2d 1008 at 1012 (5th Cir., 1973).

▪ Appellant next contends that the prosecution's failure to assure the presence of his expert at the chemical analysis of the acetone swabbings constituted prosecutorial suppression of evidence and deprived him of the effective assistance of counsel in confronting the prosecution's evidence of nitrate which the analysis disclosed. The remedy for the actions should be, according to Oglesby, the exclusion of the result of the tests. The basis for Oglesby's argument is that the prosecution reasonably expected the swabbings to be consumed in the testing process. Oglesby's attempt to raise confrontation clause problems is foiled by this court's en banc decision in United States v. Williams, 447 F.2d 1285 (5th Cir., 1971), rev'g 424 F.2d 344 (1970). The court was there faced with a problem resulting from "[t]he admission of expert witness testimony based upon records not themselves introduced in evidence . . . ." Id. at 1287. After an extensive analysis of the right of confrontation issue [4] the court concluded

4. Writing for the en banc court on the confrontation clause question, Judge Morgan stated:

"The first question before the court is whether the admission of Jeffrey's expert witness testimony violated Williams' Sixth Amendment right of confrontation. In its per curiam opinion denying the motion for rehearing, the original panel of this court relied on California v. Green, supra, [399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)] to support its decision that the admission of Jeffrey's testimony violated the confrontation clause. This reliance by the panel on *Green* was misconceived. Indeed, Green makes it clear that there is no Sixth Amendment obstacle to the admission of Jeffrey's testimony.

"In *Green*, the Supreme Court held that the admission of the prior inconsistent statement of a witness as substantive evidence in a criminal case did not violate the confrontation rights of the accused so long as the witness was present

at trial and available for cross-examination. The relevance of *Green* to the case at bar is that it represents the most recent effort by the Court to elaborate the nature of the right of confrontation. In its opinion, the Court observed that:

"Our own decisions seem to have recognized at an early date that it is this literal right to 'confront' the witness at the time of the trial that forms the core of the values furthered by the Confrontation Clause ∗ ∗ ∗
399 U.S. at 157, 90 S.Ct. at 1934, 26 L.Ed.2d at 496.

In support of this statement, the Court quoted with approval from Mattox v. United States, 156 U.S. 237, 242–243, 15 S.Ct. 337, 339, 39 L.Ed. 409, 411 (1895):

"The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in

that so long as the expert is available for cross-examination and there is "ample opportunity for the defense to probe the authenticity and accuracy of the sources relied upon by [the expert] and the reasoning processes by which he arrived at his [decision]," Id. at 1289 then the admission of the expert's testimony does not create a confrontation problem. Even though the defendant's expert should have been permitted to participate in the analysis of the swabbings, his absence does not require us to serve the conviction because the standard established by *Williams* was fulfilled here.

Our decision in this regard is supported by the Ninth Circuit's decision in United States v. Sewar, 468 F.2d 236 (1972), cert. den. 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973). Commenting on the admission of expert testimony relating to the concentration of alcohol found in a defendant's blood when the blood sample had been inadvertently destroyed, the court stated:

". . . Not every blunder by investigators should result in the exclusion of relevant competent, important evidence. While we would be naif to believe that no investigator would ever behave in the manner conjured up by the trial judge, we cannot administer justice upon the assumption that all or even most investigators will behave in that manner.

which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. * * *
*Green*, then, makes it clear that the confrontation guarantee focuses upon 'the right of the accused to confront and probe each of his accusers—a narrow adversary activity'.

"Given this view of the confrontation clause, it is evident that the admission of Jeffrey's testimony did not violate that guarantee. Jeffrey was personally available for cross-examination by the appellant. There was ample opportunity for

"This case is governed by United States v. Augenblick, 1969, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537. It involved the unexplained loss of a tape on which was recorded a conversation between the accused and an investigator. The tape had been unaccountably lost and so could not be used in cross-examining the investigator, who testified about the conversation. The conviction was by a military court, and the question was raised in a subsequent action for pay, in which Augenblick claimed that the conviction was constitutionally infirm. The Court of Claims held that the failure to produce the tape denied the accused due process of law. The Supreme Court reversed, in a unanimous opinion by Mr. Justice Douglas, in which he emphasized that the tapes were not suppressed, and held that the question was not one of constitutional dimension.

"*Augenblick* has been followed in United States v. Augello, 2 Cir., 1971, 451 F.2d 1167, where the police deliberately destroyed a taped recording of a conversation between the defendant and his victim because it was "unintelligible." Destruction of the tape was held not to require exclusion of the testimony of police officers, who also heard the conversation. *Augenblick* was also followed in United States v. Shafer, 7 Cir., 1971, 445 F.

the defense to probe the authenticity and accuracy of the sources relied upon by Jeffrey and the reasoning processes by which he arrived at his valuation. In light of the reasoning in *Green*, we conclude that Jeffrey's presence at the trial and his availability for cross-examination satisfied the constitutional right of confrontation regardless of whether his testimony fell within one of the traditional exceptions to the hearsay rule. Had the Government attempted to introduce the appraisal reports in evidence without calling the expert who had prepared them and offering an opportunity for cross-examination, then Williams' right of confrontation would have been infringed, but this is not the case at bar."
447 F.2d at 1289–1290.

2d 579, 582, where the government destroyed fuses and powder taken from the defendant because the items were thought dangerous to public buildings.

"In United States v. Bryant, 1971, 142 U.S.App.D.C. 132, 439 F.2d 642, heavily relied upon by Sewar, the court put the issue as 'whether intentional non-preservation by investigators—as opposed to bad faith destruction or prosecutorial withholding—of discoverable evidence amounts to illegal suppression.' *Bryant, supra*, at 644. Plainly, and without going further into *Bryant*, that case is distinguishable from the present case, where the non-preservation was unintentional."

468 F.2d 237–238.

In the context of the Jencks Act, 18 U.S.C. § 3500, the Supreme Court has indicated that the circumstances of the destruction of the evidence or material is highly important. It is also made clear that a good faith loss would not invoke the statutory sanctions of exclusion of the evidence. Compare United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) with Killian v. United States, 368 U.S. 231, 81 S.Ct. 810, 5 L.Ed. 690 (1961), and Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). Under the circumstances indicated here, it is evident that the preferred procedure under Rule 16, F.R.Crim.P. would be to permit the defendant's expert to participate in the evaluation of the acetone. It is likewise clear that the destruction of the acetone followed as a consequence of the scientific method and was not the product of governmental suppression. Nevertheless, the policy favoring disclosure indicates that in future cases participation should be allowed. Compare Dennis v. United States, 384 U.S. 855, 870–875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

Finally, Oglesby asks this court to engage in two exercises not generally undertaken by appellate courts. First, he asks that this court directly review the imposition of maximum consecutive sentences for the two charged counts; and, secondly, that the sentence be vacated and the cause remanded for resentencing due to the district court's refusal to reveal any portion of a pre-sentence investigation and report. We decline to accept either of these suggestions. A motion for reduction of sentence may be presented to the district court pursuant to Rule 35, F.R.Crim.P.

Oglesby's remaining contentions are without merit. We therefore Affirm his conviction. Love's appeal is Dismissed pursuant to Local Rule 9(b).