Danny Ray LAMB, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–622.

Court of Criminal Appeals of Oklahoma.

Jan. 31, 1977.

Rehearing Denied March 11, 1977.

Richard A. Hoffman, Asst. Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Danny Ray Lamb, hereinafter referred to as defendant, was charged in the District Court, Tulsa County, Case No. CRF–75–2329, with the offense of Robbery with Firearms, After Former Conviction of a Felony. Punishment was assessed at thirty (30) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness was Tulsa Police Officer Mike Higgins, who stated that at

approximately 5:00 p. m. on September 30, 1975, he observed the defendant, Thomas Hamilton and John Lamb in a green early-fifties model Chevrolet panel truck. The witness identified the defendant as the same person he observed in the truck. Officer Higgins also identified several photographs of a truck as depicting the truck in which he had observed the defendant.

The State's second witness was Mike Freeland, proprietor of Freeland-Brown Pharmacy in Tulsa, Oklahoma. This witness stated that on the evening of September 30, 1975, he was working in the rear of the store when he heard a commotion in the front which caused him to glance up from what he was doing. He then saw two men approaching him wearing masks and one of the men was carrying a gun. Freeland and two other employees were ordered to lie on the floor. He then stated that one of the men then ordered him to collect the money and drugs and place them in plastic bags. Freeland was then ordered to lie down, once again, and not move for five minutes. He did so and the men departed. Freeland then stated that after he had been lying on the floor for about five seconds, he reached up to a telephone. While in the process of dialing zero, he heard gunfire which caused him to immediately lie down again. Several minutes later a policeman came to the store asking "is there anyone in here." The witness stood up, and lying a short distance away inside the pharmacy was one of the robbers. On cross-examination it was elicited that this witness had, at no time, observed the defendant in the pharmacy. The witness also identified a photograph as depicting the armed robber who had been shot inside the store.

Betty McGouldrick and Cindy Turney were the State's third and fourth witnesses. On the evening of September 30, 1975, they were both working in the Freeland-Brown Pharmacy in Tulsa, Oklahoma. Their testimony as to the occurrences on that evening corroborated that of Mike Freeland. They, too, were not able to place the defendant in the store at the time of the robbery.

Randy Corley was the State's fifth witness and testified that on September 30, 1975, he was "cruising" in his automobile in the vicinity of the Freeland-Brown Pharmacy in Tulsa. As he passed the pharmacy he noticed a police cruiser pull up to it with the lights off. Thinking this was unusual, Corely testified that he stopped his own car and observed the policeman jump out of the cruiser and fire his weapon at a man wearing a ski mask, who came running out of the pharmacy. The man dropped a bag and ran around the corner of the pharmacy. The witness stated that he saw a green early-fifties model Chevrolet Van moving slowly in the parking lot behind the pharmacy. He then saw a man wave down the van and jump into it. Corley stated that he observed the driver of the van, who had long blonde hair. The van then drove out of his view. This witness identified photographs as being accurate representations of the van which he observed on that night.

Officer Walter LeNoir, Tulsa Police Department, was the State's sixth witness. He stated that at approximately 8:00 p. m. on September 30, 1975, he was on patrol duty in a police cruiser and that as he passed the Freeland-Brown Pharmacy, he noticed three individuals standing alongside the building. Considering this suspicious, since there were no cars in the parking lot, Officer LeNoir turned around, cut off his lights, and stopped in the parking lot just opposite the entrance to the pharmacy. At this time the officer noted some individuals entering the store, but he stated that he did not know if they were the same individuals whom he had seen at the side of the building. He then moved his car to where he could see directly into the store. At first he was unable to see anyone in the store, but after jockeying his car back and forth, he was able to see at least one person with a mask on, carrying a gun. He then radioed for help, got out of his car, drew his revolver and waited. At about that time another officer arrived. He, too, got out of his vehicle and drew his revolver. Almost simultaneously, two men with masks and, apparently, guns, started to exit. Shooting ensued. One man fell back into the store.

The second officer pursued the other, who had run from the front in a hale of gunfire to the side of the building. The witness stated that he then entered the building and found one man lying on the floor with a wound in his back.

On cross-examination Officer LeNoir was unable to state with certainty that the three individuals whom he first observed at the side of the building were the same individuals who robbed the store. Likewise, he was unable to identify the defendant as one of the robbers, although he did state that one of the three individuals whom he first observed, had long blonde hair.

Robert Crow, Tulsa City Police Officer, next testified that he was the first officer to arrive in response to Officer LeNoir's "robbery in progress" radio message. He pulled his car in front of the pharmacy, got out and drew his revolver and fired at the person exiting the pharmacy, who had a bag and a gun in his hands. The two men who were attempting to exit fell back into the store. One then came running out, dropping the bag and gun. The officer fired several more times, but was unable to stop the van, which drove away at a high rate of speed. Crow stated that he glimpsed a long hair blonde individual driving the van, but he was unable to identify the defendant as that driver. He was able to identify photographs of the van, however.

Kelley Watson next testified that she observed the events related by the officer as she was in the vicinity at the time in question. She related how she observed the green early-fifties model van leaving the scene. Seeing that no one was in pursuit, she followed it for a short distance. She then returned to the scene and told an officer what she had observed. She then met several friends and they proceeded in two cars to try and retrace the route the van had taken. After describing the route she traversed, she related how she observed the same van parked in front of a house with several individuals standing around it. She stated that Linda Cooper was one of her friends who had followed her. The witness further stated that she was unable to identify any of the persons whom she saw standing near the van, although she did identify the photographs of the van.

After this witness was excused, the jury was dismissed until the following morning. The State indicated a desire to read, at trial, the testimony of witness Linda Cooper, who had given identification testimony at the preliminary examination on this matter. In support of his contention that this identification testimony was tainted by an overly suggestive photograph lineup, the defendant introduced the testimony of three witnesses in an in camera hearing.

The first witness on this issue was Curtis Hanks, who stated that he was investigating the robbery in question and in this regard he contacted Linda Cooper on the day prior to the preliminary examination. The officer had reason to know that Linda Cooper had seen the events in question and might have relevant information. Officer Hanks stated that he did not personally show mug shots to Linda Cooper, but that he did have a telephone conversation relative thereto and at that time he may have indicated to her that she had "picked our boy." The witness stated that at no time during the conversation did Linda Cooper indicate to him any uncertainty in her identification.

The defendant's second witness in the hearing to suppress eyewitness identification was Assistant District Attorney Richard Johnson, who stated that on the day of the preliminary examination he had a conversation with Linda Cooper concerning her testimony. He denied coaching her at all, or telling her that the defendant's hair was longer or shorter than in a picture of the defendant which she had previously identified. The witness stated that he told Ms. Cooper only to be positive, if she could, in her identification.

The defendant's third witness in this hearing was Officer Frieberger of the Tulsa Police Department, who stated that he contacted Linda Cooper shortly before the preliminary examination in order to have her look over some mug shots, one of which was

of the defendant. He stated that Ms. Cooper identified the defendant after looking over all of the photos, and that she expressed no hesitancy in making the identification. After this witness was excused, the defendant's motion to suppress the eyewitness' testimony, was denied. The jury was recalled and the trial resumed.

Tulsa Police Detective Curtis Hanks was the State's next witness at trial. He identified a photograph of the defendant as accurately depicting the way the defendant looked on October 30th, one month after the robbery. He also identified the photographs of the van.

The State then sought to introduce that portion of the transcript of the preliminary examination which recounted Linda Cooper's testimony. The defendant's objections to this were overruled, and the transcript was read. The substance of Linda Cooper's testimony was that on September 30, 1975, she was in the area of Freeland-Brown Pharmacy; that a friend, Kelley Watson, told her what had happened and that she and another friend, Judy Jones, then followed Kelley in an attempt to locate the vehicle which Kelley had seen leaving the scene of the robbery. After describing her travels, Linda related how they had discovered the van and how Linda had gotten a good view of a long blonde-haired man who was standing near the driver's door of the parked early-fifties model green Chevrolet Van. Linda Cooper identified the defendant as that man, noting that his hair was cut much shorter at the preliminary examination.

Thomas Jeffery Hamilton, then testified for the State. The substance of his testimony was that he participated in the robbery of the Freeland-Brown Pharmacy on September 30, 1975, and that he was shot and apprehended inside the pharmacy by the police. He related how he planned and executed the robbery with the defendant and with defendant's brother, John Lamb. He added supplementary information relating to how he had gained the defendant's acquaintance. Hamilton also testified to conversations that he and the defendant had in jail subsequent to their arrest. He further stated that he was given no promise for his testimony. Hamilton also testified that he did not remember giving a written statement to the police immediately following his own arrest, and lastly that several of the assertions in that statement were not true.

Deputy Sheriff Curtis Deaver next testified to the substance of several conversations between the defendant and witness Hamilton which were strongly indicative of the defendant's guilt. When this witness was excused, the State rested.

The defendant took the stand on his own behalf. He denied any participation in the crime in question, asserting that witness Hamilton had asked to borrow the panel truck on the night in question in order to get some beer, and he had never returned. The defendant stated that he knew nothing of the robbery until he was arrested. He further denied making any inculpatory statements in the presence of Deputy Deaver. He also stated that he had gotten a haircut in order to impress the jury, and not to conceal his identity in any way. The defendant asserted that prior to his arrest he ran a hauling business. The defendant specifically denied the testimony of co-defendant Hamilton.

The second witness for the defense was Thomas Burns, Assistant Public Defender in Tulsa County, who stated that he had represented the defendant in this case until about a week before trial. He further stated that he was also the attorney for witness and co-defendant Hamilton, and that he withdrew as counsel of record for defendant Lamb when he was told by Hamilton that he (that being the witness Hamilton) wished to testify against defendant Lamb. The witness stated that he continued as attorney for Hamilton and that Hamilton was promised nothing for his testimony.

The defense then rested.

The State then called Deputy Donald Carter as a rebuttal witness. His testimony corroborated that of Deputy Deaver with respect to the inculpatory statements made by the defendant while in jail, which state-

ments the defendant had specifically denied.

The defense then recalled the defendant who attempted to explain away the overheard conversation, with some measure of success.

The case then went to the jury on the court's instructions and a guilty verdict was returned.

The defendant presents only one assignment of error on this appeal. He contends that the court committed reversible error in permitting the State to read at trial the testimony of Linda Cooper given by her at the preliminary examination. As noted in the recitation of facts, Linda Cooper was the only witness, aside from co-defendant Hamilton, who positively identified the defendant as being in the vicinity of the getaway vehicle shortly after the robbery was committed. Other witnesses had gotten a glimpse of a long blonde-haired person driving a truck, but it was Ms. Cooper's testimony that put substance to these suspicions.

As a predicate to the admissibility of the preliminary transcript, the Assistant District Attorney stated that Linda Cooper had been personally served a subpoena by him and at that time he learned that the witness was pregnant and that the baby was due at any time and that her doctor had instructed her that she could not come down to court to testify. The defense counsel stipulated that these facts were true, and objected to any reading of her testimony from the preliminary examination. This was overruled. He further moved for a continuance. This was denied. From these rulings the defendant appeals.

The problems presented under this assignment are four: whether a sufficient predicate was laid; whether the transcript had sufficient indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the testimony; whether the defendant had the sufficient opportunity to cross-examine the witness; and lastly, whether on overview a continuance should have been granted.

■ There is no question in this case that the facts surrounding the unavailability are as the prosecutor reported them, inasmuch as the defendant expressly stipulated thereto. Similarly, there is no question concerning whether the prosecutor used due diligence in attempting to secure the presence of the witness, or whether he timely issued a subpoena. The only question is whether the facts recited are sufficient in themselves to prove unavailability. That is, is pregnancy and imminent birth equivalent, in this regard, to sickness or death or being without the jurisdiction? We hold that it is. In the case of *Pittman v. State,* Okl.Cr., 272 P.2d 458 (1954), we held, under similar circumstances, that the trial judge had not erred in permitting the testimony of a witness at the preliminary examination to be read at the trial, when it was made to appear through the testimony of the witness' doctor that appearance by the witness in court could cause her to have a miscarriage.

Although Ms. Cooper's doctor did not give testimony at this trial, the stipulation of facts entered into by the defendant included not only the fact that Ms. Cooper was pregnant and that birth was imminent, but also the fact that her doctor advised her not to go to court and testify. The effect of this stipulation was in essence to admit facts nearly identical to those formally proven in *Pittman v. State,* supra. Thus, on strong legal authority and surely through commonsense, pregnancy and imminent birth, coupled with a doctor's order to not testify, is a sufficient showing of unavailability to justify the course of action taken.

■ The answer to the second question, whether the transcript bore sufficient indicia of reliability, is obviously yes. The State apparently read from a certified copy of the preliminary examination transcript which had been filed with the court clerk prior to trial. This has long been held sufficient. See, *McFay v. State,* Okl.Cr., 498 P.2d 418 (1972). Additionally, the defendant makes no contention that the transcript read from was inaccurate.

The third and fourth questions related above present in this case an identical problem, that is, had the trial judge found that the defendant had not had an adequate opportunity to cross-examine the witness at the preliminary examination, then a continuance should have been granted until such time as the witness' presence could have been secured. Of course, in a case such as this where the witness' whereabouts are known and the witness expresses no hesitancy about testifying a continuance could also be granted where the grounds of unavailability are insufficient. However, the question of a continuance is left largely to the discretion of the trial judge, and without manifest abuse of discretion we cannot overturn his decision. *Williamson v. State,* Okl.Cr., 532 P.2d 444 (1975).

In the present case we find that though the defendant was not represented at the preliminary examination by the same attorney representing him at trial, the issues in both forums were the same with respect to the witness in question, and the defendant's counsel at the preliminary examination effectively cross-examined the witness with respect to those issues.

Linda Cooper's testimony was in the nature of an identification. She did not place the defendant at the scene. She only related that she had seen the defendant near the get-away vehicle some time after the robbery was committed. This is not a case where she observed the get-away vehicle leave the scene, followed it, observed its stop, and then observed the defendant get out. Rather, she observed the vehicle leave, she followed it a short distance, lost it, and then some time later she relocated the vehicle and observed the defendant near it. In the former case the observation would be that of an eyewitness, whereas in the latter it was merely circumstantial. As such, her testimony really had little more probative value than that of Officer Higgins, first witness for the State, who testified to seeing the defendant in the truck some time prior to the robbery.

On this view of the witness' testimony, we cannot say that the court abused its discretion in refusing to allow the continuance. The witness had been cross-examined thoroughly with respect to what she had seen. With respect to the question of whether the trial judge should have granted a continuance on the grounds that it was evident that the witness would soon be available to testify, we can only point out that in making such a decision, a trial judge is necessarily concerned with a need for judicial economy and a speedy disposition of cases. Taking this into account, as well as the limited probative value of the witness' testimony as outlined above, we cannot say that the failure of the trial judge to permit the jury to observe the demeanor of the witness on cross-examination was such fundamental error as would require reversal. Furthermore, as we said in *Pittman v. State,* supra, at page 463:

"In a case where the factual issue of guilt or innocence was closer than the one here presented, a different conclusion might be reached."

For the reasons herein delineated, the judgment and sentence is *AFFIRMED.*

BRETT, P. J., and BLISS, J., concur.