ANTONIO WAYNE WOOD, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 11531

August 10, 1981                                    632 P.2d 339

*William N. Dunseath,* Public Defender, and *Michael B. McDonald,* Deputy Public Defender, Washoe County, for Appellant.

*Richard H. Bryan,* Attorney General, Carson City; *Calvin R. X. Dunlap,* District Attorney, and *Edward B. Horn,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, MANOUKIAN, J.:

A jury convicted Antonio Wayne Wood for the suffocation death of his four and one-half month old son, a felony. NRS 200.030. On appeal, appellant's sole contention is that the state violated standards of due process by failing to preserve sufficient of the victim's brain tissue specimens, evidence relevant to the cause of death. Although we agree that negligence occurred resulting in the loss of some evidence, such does not require reversal.

On March 19, 1978, Antonio Wood was left in charge of his son, Joseph, and his daugther, Christina (age nineteen months), while his wife went to a nearby laundromat. At 4:24 p.m., a person who identified himself as Tony Wood, called the Sparks Police Department requesting assistance in contacting his wife at the laundromat because his son was having difficulty breathing.

When Linda Wood returned to the apartment she found Joseph unconscious in his crib. The child was rushed to Washoe Medical Center, where Joseph was found to have no pulse and no spontaneous respiration. Through emergency procedures, a pulse was restored, although respiration depended upon life support systems. Joseph's condition was characterized as a brain damage coma, and after 48 hours in intensive care, having never regained consciousness, he died.

Wood initially maintained to police that Christina had crawled into the crib with Joseph and crawled on top of the baby apparently pushing his face into a diaper preventing his breathing. The medical symptoms were consistent with some type of suffocation. Wood, during police interviews, subsequently recanted his story and admitted that he had placed a diaper over Joseph's mouth for a prolonged period of time to quiet his crying. This prosecution ensued.

To prove motive and intent, the state introduced evidence of Wood's conversations with a co-employee about methods of killing a person in order to collect life insurance proceeds, and that Wood had purchased life insurance on Joseph's life. Wood had told the co-employee that he had previously attempted to kill his wife, and continued to discuss different ways that he might kill either his wife or one of his children or all of them. During the week preceding March 19, 1978, Wood told this co-employee that he had to do something soon, and that he shouldn't be surprised "if I [Wood] don't show up for work on Monday."

The defense maintained that the resultant death of Joseph was unintentional and that the death was not caused by strangulation but rather by some other medical phenomenon. Dr. Ellis, a board-certified neurologist and neuropathologist, specializing in the pathology of brain diseases in children, was called as an expert witness on behalf of Wood. Dr. Ellis testified that the brain of the deceased child did exhibit oxygen deficiency (anoxia), but that several processes producing such anoxia could have been initiated by the placing of the diaper over the mouth of the child for a brief period of time. Dr. Ellis disagreed with Dr. Campbell, who performed the autopsy, that the "immediate cause of death was due to the suffocation," and described four mechanisms which would retard the spontaneous respiration reflex,[1] thus rendering the resultant death unintentional. The four mechanisms described by Dr. Ellis were: (1) continued obstruction of the airway; (2) laryngospasm; (3) vasovagal reflex, and (4) seizure.

Based upon his examination of the tissue samples preserved by the state,[2] Dr. Ellis discounted the continued obstruction theory (suffocation) due to lack of bruises, coupled with his determination that the amount of brain damage was less than expected from his assessment of the history of the case. Dr. Ellis admitted that because he did not have specimens from the correct areas of the brain, his alternate explanations were merely theories. Nevertheless, he remained adamant that there was too much evidence to summarily dismiss the seizure theory. Claiming that the failure to preserve sufficient tissue

[1]This is the reflex action which causes the resumption of breathing in an unconscious person if nothing else is present to interfere with the breathing mechanism.

[2]Dr. Campbell testified that he removed approximately four tissue samples from the brain. Dr. Ellis indicated that he found cells from five or six different areas of the brain. The United States Armed Forces Institute of Pathology lists as essential seven specific brain areas for the examination.

samples to prove this alternate theory was a violation of his due process rights, Wood appeals.

We have often held that where evidence is lost as a result of inadequate governmental handling, a conviction may be reversed. Crockett v. State, 95 Nev. 859, 603 P.2d 1078 (1979); Howard v. State, 95 Nev. 580, 600 P.2d 214 (1979); Williams v. State, 95 Nev. 527, 598 P.2d 1144 (1979). *See also* United States v. Heiden, 508 F.2d 898 (9th Cir. 1974). The test for reversal on the basis of lost or destroyed evidence we have heretofore relied upon was enunciated in Crockett v. State, *supra,* and requires that the appellant show either "(1) bad faith or connivance on the part of the government, *or* (2) prejudice from its loss." This standard was derived from the case of United States v. Heiden, *supra,* which was recently broadened in the case of United States v. Loud Hawk, 628 F.2d 1139, 1152 (9th Cir. 1979). The state urges us to reexamine our established standard and to adopt the *Loud Hawk* approach. However, in the context of this case, we find it unnecessary to adopt the "balancing approach" announced in *Loud Hawk*.

In the instant case, the record is silent as to any connivance or bad faith on the part of the state to preserve evidence. Indeed, appellant has stipulated to the absence thereof. Dr. Campbell, the State's pathologist, testified that storage problems prevented preservation of whole organs, so that representative samples from each organ are usually taken and preserved. Although he admitted that a neuropathologist would be most qualifed to examine brain tissues for changes, and that he knew the case would be "one for investigation" since the autopsy findings were likely to be non-specific, he nevertheless stated that he saved only four tissue samples of the brain. Any culpability on the part of the state consists only of the state's negligence in failing to adhere to established pathological standards. *See* footnote 2, *supra*.

Appellant asserts that the failure to preserve tissue of certain areas of the brain is "critical evidence" concerning the cause of death to the deceased, and that as in Crockett v. State, 95 Nev. at 865, 603 P.2d at 1082, "scientific verification is forever foreclosed because the government did not properly preserve the [evidence]." This, appellant maintains, meets the burden enunciated in Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979), that it is "reasonably anticipated that the evidence sought would be exculpatory and material to appellant's

defense." However, contrary to *Crockett* and *Boggs,* the evidence here was not "direct exculpatory evidence," but merely evidence which Wood's expert opined would have helped confirm one of the alternate theories of death. During cross-examination, relative to the defense's alternate theory of death, Dr. Ellis conceded that the only evidence of seizure activity was the changes in Joseph's brain, and that before the March 19 incident there was no history of any seizures and that under any theory that the initiating cause of death was the placing of the diaper over the child's mouth.

Although the prosecution's case was largely circumstantial, in weighing the totality of the circumstances, including appellant's incriminating statements, his remarks to the co-employee, the fact that both the state and the accused presented extensive medical testimony and the extensive cross-examination by defense counsel, Wood's due process rights were not violated. The factual inferences that the additional tissue samples might have raised, were treated by the appellant's expert witness as alternate theories and although analysis of the unavailable tissue samples may have given more credibility to one of the alternative theories, their absence did not work to deprive appellant of his due process rights.

The judgment of conviction is affirmed.

GUNDERSON, C. J., and BATJER, SPRINGER, and MOWBRAY, JJ., concur.